Filed 10/12/21

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CHEVRON U.S.A., INC., et al., | H045791 |
| Plaintiffs and Respondents, | (Monterey County Super. Ct. No. 16CV003978) |
| v. | |
| COUNTY OF MONTEREY, | |
| Defendant; | |
| PROTECT MONTEREY COUNTY et al., | |
| Interveners and Appellants. | |

Appellant Protect Monterey County (PMC) appeals from the trial court's judgment striking down a County ordinance banning "land uses in support of" new oil and gas wells and "land uses in support of" wastewater injection in unincorporated areas of Monterey County. These ordinances were enacted as part of Measure Z, an initiative sponsored by PMC and passed by Monterey County voters. The trial court upheld, in part, a challenge to Measure Z by plaintiffs, numerous oil companies and other mineral rights holders in Monterey County.[1] PMC contends that the trial court erroneously

---

[1] Six separate actions were consolidated below. One was brought by Aera Energy LLC (Aera). A second action was brought by Chevron U.S.A. Inc. and a group of other entities, which we will refer to collectively as Chevron. A third action was brought by California Resources Corporation (CRC). The fourth action was brought by National Association of Royalty Owners-California, Inc. and various individuals and entities, which we will refer to collectively as NARO. A fifth action was brought by Eagle Petroleum, LLC (Eagle). The sixth action was brought by Trio Petroleum LLC and

concluded that these two components of Measure Z were preempted by state and federal laws and that they constituted a facial taking of the property of some plaintiffs. PMC also contends that the trial court made prejudicially erroneous evidentiary rulings.

We find that the trial court correctly concluded that these two components of Measure Z are preempted by Public Resources Code section 3106.[2] Section 3106 explicitly provides that it is the State of California's oil and gas supervisor who has the authority to decide whether to permit an oil and gas drilling operation to drill a new well or to utilize wastewater injection in its operations. These operational aspects of oil drilling operations are committed by section 3106 to the State's discretion and therefore local regulation of these aspects would conflict with section 3106. Our narrow holding does not in any respect call into question the well-recognized authority of local entities to regulate the location of oil drilling operations, a matter not addressed by section 3106 or Measure Z.

Because we uphold the trial court's decision on the grounds of state law preemption, we need not consider whether Measure Z is also preempted by federal law or constituted a facial taking of plaintiffs' property. We also need not address PMC's challenge to the trial court's evidentiary rulings as those rulings play no role in the resolution of the state law preemption issue, which is an entirely legal issue. We affirm the trial court's judgment.

## I.    MEASURE Z

Measure Z was a citizens' initiative on the November 2016 Monterey County ballot entitled: "Protect Our Water: Ban Fracking and Limit Risky Oil Operations Initiative." It proposed to amend Monterey County's general plan to add three new land

---

two other corporations, which we will refer to collectively as Trio. The six actions were consolidated by the trial court for the Phase 1 trial.

[2] All further statutory references are to the Public Resources Code unless otherwise indicated.

2

use policies. LU-1.21, which is not at issue in this appeal, would prohibit "Land Uses . . . in support of well stimulation treatments" throughout the County's unincorporated areas.[3] LU-1.22 would prohibit "Land Uses . . . in support of oil and gas wastewater injection or oil and gas wastewater impoundment" throughout the County's unincorporated areas. LU-1.23 would prohibit "Land Uses in Support of Drilling New Oil and Gas Wells" anywhere in the County's unincorporated area. Measure Z also would amend Monterey County's local coastal program and its Ford Ord Master Plan to add identical prohibitions.

Measure Z contained a section setting forth "exemptions" for "any person or entity exercising a vested right obtained pursuant to State law" and provided for "a reasonable amortization period" for phasing out uses that were inconsistent with Measure Z's provisions. Measure Z also stated that its provisions would not be applied to the extent "that they would violate the constitution or laws of the United States or the State of California." Measure Z authorized the Board of Supervisors to grant an exception to a property owner if the application of Measure Z would result in an unconstitutional taking.

Measure Z identified its purpose as "protect[ing] Monterey County's water, agricultural lands, air quality, scenic vistas, and quality of life" by "prohibit[ing] and phas[ing] out land uses in support of oil and gas wastewater . . . disposal using injection wells or disposal ponds in the County's unincorporated area" and "prohibit[ing] drilling new oil and gas wells in the County's unincorporated area." Measure Z asserted that

---

[3] Chevron conceded at the outset of the Phase 1 trial that it was not using well stimulation techniques or hydraulic fracturing at the San Ardo Field, where Chevron's Monterey County drilling operations were located. However, Chevron argued that "the possibility that Chevron might in the future use well stimulation or may need to or may decide to, that's enough for standing." NARO also conceded that "nobody's using hydrofracturing at the moment and probably—maybe never again in the County of Monterey." The trial court ultimately rejected plaintiffs' challenges to LU-1.21 based on its finding that they lacked standing to challenge that aspect of Measure Z. That ruling is not at issue in this appeal.

3

these policies would "promote[] and protect[] the health, safety, welfare, and quality of life of County residents . . . ." Measure Z was passed by the voters in November 2016.

## II. PROCEDURAL BACKGROUND

Beginning in December 2016, plaintiffs filed multiple mandate petitions and complaints for declaratory and injunctive relief and for inverse condemnation against defendant County of Monterey (the County).[4] Plaintiffs alleged that Measure Z was preempted by state and federal law and would result in an unconstitutional taking of their property. The court stayed the effective date of Measure Z after the County and plaintiffs stipulated to a stay. PMC intervened in the actions.[5]

After a multi-day trial that consisted entirely of argument by counsel based on voluminous declarations and exhibits, the court issued an extensive statement of decision. The court found that plaintiffs lacked standing to challenge LU-1.21 because no plaintiff was using or proposing to use any well stimulation treatments in Monterey County. The court found that LU-1.21 was severable from LU-1.22 and LU-1.23.

The court proceeded to plaintiffs' challenge to LU-1.22, which barred wastewater injection and impoundment. The court credited plaintiffs' arguments that this aspect of Measure Z was preempted by state law. The court rejected PMC's claim that Measure Z was simply a "land use" prohibition. The court characterized this argument as "clearly a pretextual attempt to do indirectly what it cannot do directly." The court focused on the lack of any "meaningful distinction between wastewater injection and impoundment on the one hand, and surface equipment and activities in support of wastewater injection and

---

[4] The court consolidated the six cases filed by plaintiffs for purposes of the "Phase 1" trial, which was to resolve the facial challenges to Measure Z, including preemption and takings. The County has not appeared in this appeal.

[5] The Center for Biological Diversity (the Center) also sought to intervene. The trial court denied the Center's motion, but granted PMC's motion to intervene. The court also permitted PMC's spokesperson, Dr. Laura Solorio, to intervene. We will refer to PMC and Solorio collectively as PMC.

4

impoundment on the other." The court eschewed the distinction between surface and subsurface activities and instead concluded that the key issue was whether Measure Z "regulates the *conduct* of oil and gas operations or their permitted *location*." The court viewed LU-1.22 as "regulat[ing] a specific *production technique* . . . ." The court found it significant that "Measure Z is a ban on specific production techniques *not* a total ban on oil operations." Because, in the trial court's view, state law "fully occupies the area of the manner of oil and gas production," and LU-1.22 "seeks to regulate the manner of oil and gas production," the court found that LU-1.22 was preempted. The court also found that LU-1.22 conflicted with section 3106. In addition, the court found that LU-1.22 conflicted with the state's authority under the federal Safe Drinking Water Act (SDWA) because the State, not local authorities, was authorized to make the findings that Measure Z purported to make regarding whether underground wastewater injection would endanger drinking water sources. Thus, the SDWA also preempted LU-1.22.

The court proceeded to LU-1.23. It found that the ban on new wells conflicted with the SDWA because LU-1.23 necessarily banned wastewater injection. It also found that the new well ban was preempted because it would prevent plaintiffs from maintaining the "steam chest" that was "necessary to their profitable operation" and from drilling new wells for wastewater disposal purposes as permitted by section 3106.

The court then addressed the facial takings claim. The court found that the exemption procedure provided for in Measure Z violated due process so plaintiffs were not required to exhaust administrative remedies. The court found that LU-1.22 and LU-1.23 would cause a facial taking as to those plaintiffs who had no active wells, but no remedy was necessary because those two provisions were preempted. As to those plaintiffs who had active wells, the court found no facial taking.

5

The court entered judgment and issued a writ of mandate directing the County to invalidate LU-1.22 and LU-1.23. PMC timely filed a notice of appeal from the judgment.[6]

## III.   DISCUSSION

### A.   *State Law Preemption*

PMC contends that the trial court erred in finding that LU-1.22 and LU-1.23 are preempted. Plaintiffs maintain that Measure Z[7] is preempted under state law because it conflicts with section 3106.

"Under article XI, section 7 of the California Constitution, '[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations *not in conflict with general laws*.' [¶] 'If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void.' [Citations.] [¶] 'A conflict exists if the local legislation " 'duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.' " ' [Citations.] [¶] Local legislation is 'duplicative' of general law when it is coextensive therewith. [Citation.] [¶] Similarly, local legislation is 'contradictory' to general law when it is inimical thereto. [Citation.] [¶] Finally, local legislation enters an area that is 'fully occupied' by general law when the Legislature has expressly manifested its intent to 'fully occupy' the area [citation], or when it has impliedly done so in light of one of the following indicia of intent: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in

---

[6] Some of the other parties also filed notices of appeal, but all of them subsequently dismissed their appeals.

[7] We refer to these two policies as Measure Z in our analysis for ease of reference, even though Measure Z also encompasses LU-1.21, which is not at issue in this appeal and which the trial court did not find preempted. Our references to Measure Z should not be misunderstood to include LU-1.21.

6

such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality [citations]." (*Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897-898, fn. omitted, italics added.)  "The party claiming that general state law preempts a local ordinance has the burden of demonstrating preemption." (*Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1149 (*Big Creek*).)  "Whether state law preempts a local ordinance is a question of law that is subject to de novo review." (*Roble Vista Associates v. Bacon* (2002) 97 Cal.App.4th 335, 339.)

The trial court found that Measure Z is preempted by state law because, among other things, Measure Z *conflicts* with section 3106, which not only *permits* and *encourages* the drilling of new wells and the use of wastewater injection but explicitly *vests in the State the authority to permit* this conduct.[8]  Since Measure Z *prohibits* all wastewater injection and bans new well drilling, the trial court found that section 3106 preempts Measure Z.

PMC argues that Measure Z is not preempted by state law because "California oil and gas statutes and regulations expressly acknowledge and affirm local authority, precluding a finding that the state has completely occupied the field," and "state law addresses only specific, technical aspects of oil and gas production, leaving local governments free to exercise their traditional authority over land use, health, and safety to protect communities from harm."

Plaintiffs' position, on the other hand, is that section 3106 "*mandate*[*s*] that oil and gas producers *be allowed* to undertake wastewater injection projects properly approved

---

[8] As we determine that Measure Z *conflicts* with section 3106, we need not consider plaintiffs' claim that the State has preempted the *field* of oil and gas regulation.

7

by the Oil and Gas Supervisor and also be *allowed* to undertake oil and gas well drilling projects properly approved by the Oil and Gas Supervisor."

We begin with the text of section 3106:

"(a) The [State Oil and Gas] supervisor[9] shall so supervise the drilling, operation, maintenance, and abandonment of wells and the operation, maintenance, and removal or abandonment of tanks and facilities attendant to oil and gas production, including pipelines not subject to regulation pursuant to Chapter 5.5 (commencing with [s]ection 51010) of Part 1 of Division 1 of Title 5 of the Government Code that are within an oil and gas field, so as to prevent, as far as possible, damage to life, health, property, and natural resources; damage to underground oil and gas deposits from infiltrating water and other causes; loss of oil, gas, or reservoir energy, and damage to underground and surface waters suitable for irrigation or domestic purposes by the infiltration of, or the addition of, detrimental substances. [¶] (b) The supervisor shall also supervise the drilling, operation, maintenance, and abandonment of wells so as to permit the owners or operators of the wells to utilize all methods and practices known to the oil industry for the purpose of increasing the ultimate recovery of underground hydrocarbons and which, in the opinion of the supervisor, are suitable for this purpose in each proposed case. To further the elimination of waste by increasing the recovery of underground hydrocarbons, it is hereby declared as a policy of this state that the grant in an oil and gas lease or contract to a lessee or operator of the right or power, in substance, to explore for and remove all hydrocarbons from any lands in the state, in the absence of an express provision to the contrary contained in the lease or contract, is deemed to allow the lessee or contractor, or the lessee's or contractor's successors or assigns, to do what a prudent operator using reasonable diligence would do, having in mind the best interests of the lessor, lessee, and the state in producing and removing hydrocarbons, including, but not

---

[9] Section 3004 provides: " 'Supervisor' means the State Oil and Gas Supervisor."

limited to, the injection of air, gas, water, or other fluids into the productive strata, the application of pressure heat or other means for the reduction of viscosity of the hydrocarbons, the supplying of additional motive force, or the creating of enlarged or new channels for the underground movement of hydrocarbons into production wells, when these methods or processes employed have been approved by the supervisor, except that nothing contained in this section imposes a legal duty upon the lessee or contractor, or the lessee's or contractor's successors or assigns, to conduct these operations. [¶] (c) The supervisor may require an operator to implement a monitoring program, designed to detect releases to the soil and water, including both groundwater and surface water, for aboveground oil production tanks and facilities. [¶] (d) To best meet oil and gas needs in this state, the supervisor shall administer this division so as to encourage the wise development of oil and gas resources." (§ 3106.)

We agree with plaintiffs that the text of section 3106 supports the trial court's preemption finding. Section 3106 identifies the State's *policy* as "*encourag*[*ing*] the wise development of oil and gas resources," and expressly provides that *the State* will supervise the drilling of oil wells "so as to *permit*" the use of "*all*" practices that will increase the recovery of oil and gas. (§ 3106, italics added.) In doing so, section 3106 plainly lodges the authority to permit "all methods and practices" firmly in *the State's hands*. Section 3106 makes no mention whatsoever of any reservation to local entities of any power to limit the State's authority to permit well operators to engage in these "methods and practices."

The legislative history of section 3106 is consistent with our understanding of the statute's text. Section 3106 was originally enacted in 1939 when the Public Resources Code was first created. (Stats. 1939, ch. 93, § 3106.) At that time, section 3106 provided: "The supervisor shall so supervise the drilling, operation, maintenance, and abandonment of wells as to prevent, as far as possible, damage to underground oil and gas deposits from infiltrating water and other causes, loss of oil and gas, and damage to

9

underground and surface waters suitable for irrigation or domestic purposes by the infiltration of, or the addition of, detrimental substances, by reason of the drilling, operation, maintenance, or abandonment of wells." (Stats. 1939, ch. 93, § 3106, p. 1112.) We see no indication in this original version of section 3106 of any preemption of local authority.

However, the language of subdivision (b) of section 3106, which is the critical one for our purposes, was added in 1961.[10] (Stats. 1961, ch. 2074, § 1.) It read essentially as it reads today. Subdivision (a) was amended in 1970 to require the supervisor to "*prevent, as far as possible, damage to life, health, property, and natural resources . . .*" (Stats. 1970, ch. 799, § 1, italics added.) While the 1970 amendment acknowledged the potential for negative local impacts from oil drilling operations, section 3106 continued to lodge the power to supervise these operations in the hands of the State.

In 1972, the text that is now subdivision (d) was added. (Stats. 1972, ch. 898, § 7.) The legislative history identifies the purpose of this amendment as "strengthen[ing] the role" of the California Department of Conservation's Division of Oil, Gas, and Geothermal Resources (DOGGR),[11] the State entity supervising oil drilling and operations, "in dealing with environmental problems." (Resources Agency's Enrolled Bill Rep. on Sen. Bill No. 1022 (1972 Reg. Sess.) August 11, 1972.) There have been no subsequent material amendments to section 3106.[12]

---

[10] A 1957 amendment added "or reservoir energy" after "loss of oil, gas". (Stats. 1957, ch. 405, § 7.) It made no other change.

[11] DOGGR became the Division of Geologic Energy Management (CalGEM) on January 1, 2020. (§ 3002.) We continue to refer to it as DOGGR in this opinion as the trial court and the parties have done.

[12] The 1989 amendment added additional methods to the second paragraph, and added a third paragraph, before the final sentence, giving the supervisor authority to impose a monitoring program. (Stats. 1989, ch. 1383, § 2.) The 1994 amendment granted the supervisor authority over tanks, pipelines, and other facilities. (Stats. 1994, ch. 523, §3.)

PMC argues that, despite the language of section 3106 lodging the authority to supervise and permit oil and gas operational "methods and practices" throughout the State, the State's statutes and regulations have "explicitly recognized and preserved local authority." Yet none of the statutes identified by PMC as preserving local authority reflect that the authority vested in the State by section 3106 to decide whether to permit oil and gas operational "methods and practices" is to be shared with local entities.[13]

PMC first points to section 3012, which provides: "The provisions of this division apply to any land or well situated within the boundaries of an incorporated city in which the drilling of oil wells is now or may hereafter be prohibited, until all wells therein have been abandoned as provided in this chapter." (§ 3012.) We note that section 3012 predates the enactment of subdivision (b) of section 3106. (Stats. 1939, ch. 93, § 3012, p. 1110.) What is important to observe about section 3012 is that while it recognizes that a city may ban oil operations entirely, at the same time it mandates that *the State* continue to exercise authority over any existing oil wells. It therefore provides no support for PMC's argument that the State has ceded to local entities any of the State's authority over oil drilling operational methods and practices.

PMC also directs our attention to section 3690, which provides: "This chapter [(chapter 3.5)] shall not be deemed a preemption by the state of any existing right of cities and counties to enact and enforce laws and regulations regulating the conduct and location of oil production activities, including, but not limited to, zoning, fire prevention,

---

[13] Division 3 of the Public Resources Code contains a large number of statutes regulating oil and gas. Chapter 1, article 3 regulates well stimulation treatments. (§§ 3150-3161.) Article 4 regulates the operation of oil and gas wells. (§§ 3200-3238.) Section 3203 authorizes the supervisor to approve the drilling of a well. Article 4.4 regulates oil and gas production facilities. (§§ 3270-3270.6.) Article 6 establishes an administrative appeal process for challenging orders by the supervisor. (§§ 3350-3359.) Chapter 3 regulates the spacing of wells. (§§ 3600-3609.) Chapter 3.5 deals with "unit operations."

11

public safety, nuisance, appearance, noise, fencing, hours of operation, abandonment, and inspection." Although this language on its face might seem to provide some support for PMC's argument, its limitation to chapter 3.5 reflects otherwise. Chapter 3.5 concerns "unit operations," and consists of sections 3630 through 3690, which obviously does not include section 3106. Thus, section 3690's provision that *chapter 3.5* does not preempt local regulations provides no support for the proposition that *section 3106* does not preempt local regulation of oil drilling operational methods and practices.

PMC argues that the Legislature's 2013 enactment of Senate Bill No. 4 demonstrates that section 3106 does not preempt local authority over oil and gas drilling operational methods and practices. Senate Bill No. 4 addressed only "hydraulic fracturing and other well stimulation treatments," which are not at issue in this appeal. (Stats. 2013, ch. 313, § 1.) PMC identifies two provisions of Senate Bill No. 4 that, in PMC's view, preserved local authority. Section 3160, subdivision (n) provides: "This article [(article 3, sections 3150 through 3161, which concern well stimulation)] does not relieve the division or any other agency from complying with any other provision of existing laws, regulations, and orders." Section 3161, subdivision (b)(1)(C) concerns environmental review of an oil well operator's use of well stimulation pending the adoption of state regulations addressing well stimulation. Section 3161 provides that the environmental review of such use is to be done by DOGGR, but this subdivision provides that "[t]his paragraph does not prohibit a local lead agency from conducting its own EIR."

PMC claims that section 3160, subdivision (n) requires compliance with local regulations, thereby implying that local entities retain the power to regulate oil drilling operational methods and practices. The narrow scope of section 3160, subdivision (n) belies this claim. That subdivision applies only to well stimulation and concerns the obligations of DOGGR and other agencies. Nothing in that subdivision implicates the provisions of section 3106, subdivision (b) that we find preempt Measure Z. Similarly,

section 3161, subdivision (b)(1)(C) is also limited to well stimulation and does not explicitly or implicitly grant local entities the power to regulate anything other than well stimulation, which is not at issue in this appeal. Clearly, the Legislature may choose to carve out some oil drilling operational methods and practices for the exercise of shared regulatory power between local entities and the State. At most, these statutes may show that the Legislature carved out well stimulation methods and practices as an area of shared regulatory authority.

PMC also suggests that there is no preemption because provisions in plaintiffs' leases require them to comply with local laws. The leases themselves are not state laws and cannot conflict with state laws. We see nothing in these standard lease provisions, requiring the operators to comply with all laws and regulations, to suggest that *the State* was ceding all or part of its authority under section 3106, subdivision (b) to local entities.

PMC and the amici make much of a line of authority affirming that local regulation of oil and gas drilling is *within the police power* of local entities, and they argue that this line of authority rebuts any preemption claim.

California courts have long viewed local zoning regulation of oil and gas drilling to be within a local entity's police power. Nearly a century ago, the California Supreme Court reversed the dismissal of an action by an oil company against a city because the local regulation had targeted one oil company's land but not that of its competitors, but the court acknowledged that local regulation of "the business of operating oil wells" was properly within the local entity's police power. "A municipality is not permitted, under the guise of regulating business and segregating it to a particular district, to grant a monopoly to business establishments and enterprises already situated in unrestricted districts. [Citation.] The City of Huntington Beach has the unquestioned right to regulate the business of operating oil wells within its city limits, and to prohibit their operation within delineated areas and districts, if reason appears for so doing." (*Pacific Palisades Asso. v. City of Huntington Beach* (1925) 196 Cal. 211, 216-217.)

13

In *Beverly Oil Co. v. City of Los Angeles* (1953) 40 Cal.2d 552, an oil company challenged a city's ordinance banning new oil wells and prohibiting redrilling of existing wells to new depths. The California Supreme Court rejected the challenge. "It must be deemed to be well settled that the enactment of an ordinance which limits the owner's property interest in oil bearing lands located within the city is not of itself an unreasonable means of accomplishing a legitimate objective *within the police power of the city.*" (*Id.* at p. 558, italics added.)

In *Higgins v. City of Santa Monica* (1964) 62 Cal.2d 24, the California Supreme Court considered whether a 1939 City of Santa Monica initiative prohibiting oil drilling could properly be applied to tidelands that the State had explicitly granted power over to the city. (*Id.* at pp. 26-28.) The *Higgins* court rejected the argument that state laws had *preempted the field* with respect to oil drilling *on tidelands*. It found that state laws limited to tidelands had expressly vested discretion in the city to decide whether there should be oil drilling on the tidelands. (*Id.* at p. 32.)

*Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach* (2001) 86 Cal.App.4th 534 involved, among other things, whether a citizens' initiative banning oil drilling in the city was a valid exercise of the city's police power. (*Id.* at pp. 543-545, 548.) The court held: "Enactment of a city ordinance prohibiting exploration for and production of oil, unless arbitrary, is a valid exercise of the municipal police power." (*Id.* at p. 555.)

The mere fact that *some* local regulation of oil and gas drilling is within a local entity's police power does not resolve the question of whether a particular local regulation is *preempted* by a particular state law. If a local regulation conflicts with a state law, the local regulation exceeds the local entity's power. (Cal. Const. art. XI, § 7 ["A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws"].) With the exception of *Higgins*, none of these cases even considered whether an otherwise valid local

14

regulation was preempted by state law. *Pacific Palisades* predated the enactment of the Public Resources Code, and *Beverly Oil* predated the addition of the language that now appears in section 3106, subdivision (b). While *Hermosa Beach* came after the language that became subdivision (b) was added to section 3106, the Court of Appeal did not consider whether the local regulation was preempted. "[I]t is axiomatic that cases are not authority for propositions not considered." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176.) *Higgins* considered a preemption argument, but that argument was limited to specific state laws concerning tidelands over which the State, in that case, had expressly granted the local entity full authority. We find no support for PMC's argument in this line of authority.

PMC contends that Measure Z's provisions are not preempted because "the state's oil and gas rules narrowly address only the manner in which operations are carried out, not whether or where oil and gas resources should be developed." PMC asserts that "state law's exclusive focus on the technical manner in which oil and gas production occurs leaves ample room for the exercise of local police power and land use authority." PMC argues that Measure Z controls only "where and whether" oil drilling occurs, which it contends are outside the purview of the State's laws.

PMC's myopic view of Measure Z's provisions cannot be reconciled with the actual import of those provisions. The trial court found that Measure Z "regulates the *conduct* of oil and gas operations" and "specific *production technique*[*s*]" rather than the use of land. We agree. Measure Z did not identify *any* locations *where* oil drilling may or may not occur. Instead, it permitted continued operation of existing wells but barred new wells and wastewater injection even if the new wells and wastewater injection would be on the same land as the existing operation. These provisions did not regulate "where and whether" oil drilling would occur on land in the unincorporated areas of the County

15

but rather *what* and *how* any oil drilling operations could proceed.[14] Operations could proceed only if they involved no new wells and no wastewater injection, which are operational methods and practices.

An accurate characterization of Measure Z's provisions is at the crux of the dispute between PMC and plaintiffs. While Measure Z does not regulate many of the technical aspects of oil drilling operations addressed by the voluminous state statutes and regulations, it does ban activities that section 3106 not only promotes and encourages, but also explicitly places the authority to permit in the hands of the State. Consequently, Measure Z conflicts with section 3106. The fact that Measure Z repeatedly uses the words "use of land" and "land use" does not obliterate the inescapable fact that Measure Z would ban specific oil and gas drilling operational methods and practices that section 3106 places solely under the authority of the State.

PMC insists that Measure Z does not conflict with section 3106.[15] It cites *City of Dublin v. County of Alameda* (1993) 14 Cal.App.4th 264 for the proposition that a state law that "permits but does not require" a particular practice does not preempt a local

---

[14] We decline to resolve the parties' dispute over whether Measure Z regulates "subsurface" activity as the resolution of that specific dispute is unnecessary to our analysis. We also see no need to rely on the 1976 Attorney General's opinion that the parties both rely on as we review this legal issue de novo. Nevertheless, we note that the 1976 Attorney General's opinion is consistent with our view. It found that "certain phases of oil and gas activities are of statewide rather than local concern and that any local regulation in conflict with those phases would therefore be ineffective; in our view, the state has so fully occupied these certain phases that there is no room left for local regulation." (59 Ops.Cal.Atty.Gen. 461, 477.) Having different regulations in different locations would be particularly problematic where oil and gas deposits extended under the boundaries of multiple local jurisdictions. (*Ibid.*) The Attorney General concluded that this preemption of local control extended to anything that the supervisor had approved. (*Id.* at p. 478.)

[15] The parties argue at length over whether Measure Z is entitled to a presumption against preemption. We see no need to address these competing arguments as any presumption was amply rebutted in this case. Preemption is established as a matter of law.

16

entity from banning that practice. (*Id.* at p. 278.) In *Dublin*, a County initiative banned incineration and promoted recycling. A state law permitted incineration. The Court of Appeal found no preemption because "several sections of the [state] Act demonstrate that the decision to permit or disallow incineration is a matter for the discretion of each city or county." (*Ibid.*) The same cannot be said here. Although PMC argues otherwise, it has failed to identify any provision of state law that, contrary to section 3106, reflects that the Legislature intended to reserve all or part of the authority to make decisions about whether an oil drilling operation should be permitted to drill new wells or utilize wastewater injection for the discretion of local entities. Instead, section 3106 explicitly encouraged all methods that would increase oil production, including wastewater injection, and, crucially, placed the decision-making power in the State.

PMC also relies on *People ex rel. Deukmejian v. County of Mendocino* (1984) 36 Cal.3d 476 (*Mendocino*). In that case, the California Supreme Court found that a local ordinance was not preempted because the state laws required compliance with local regulations and lodged "wide discretion" in local authorities, a situation which is not present here. (*Id.* at pp. 486-487.) The *Mendocino* case also did not involve a *conflict* between local and state law, but instead a question of *field* preemption. (*Id.* at pp. 486-488.)

PMC contends that conflict preemption does not apply here because section 3106 does not "demand" what Measure Z "forbids." It argues that Measure Z "does not require the Supervisor to permit any specific practice." PMC misreads the authorities it cites.

In *T-Mobile West LLC v. City and County of San Francisco* (2019) 6 Cal.5th 1107, the California Supreme Court observed: " 'The "contradictory and inimical" form of preemption does not apply unless the ordinance directly requires what the state statute forbids or prohibits what the state enactment demands.' [Citations.] '[N]o inimical conflict will be found where it is reasonably possible to comply with both the state and

17

local laws.' " (*Id*. at p. 1121.)  In *T-Mobile*, unlike here, the state statutes made no mention of the subject matter addressed by the local ordinance so there was no conflict. Here, section 3106 specifically addresses the drilling of wells and the injection of wastewater, encourages both practices, and, critically, explicitly places the authority to permit these methods and practices in the hands of the State.  It is not possible for the authority to permit these methods and practices to rest in the State's hands if the local ordinance forbids these methods and practices.  As the two laws conflict with respect to who controls the use of these methods and practices, the local ordinance must yield to the supreme state law.

PMC's reliance on *Big Creek* is also misplaced.  The state law in *Big Creek* contained an *express* preemption clause that was limited to " 'the *conduct* of timber operations,' " while at the same time "general forestry law . . . expressly recognize[d] local zoning authority." (*Big Creek*, *supra*, 38 Cal.4th at pp. 1151, 1157, italics added.) The local zoning ordinance limited timber operations to certain zoning districts.  (*Id.* at p. 1157.)  The California Supreme Court, noting that state law expressly favored permitting local entities " ' "the maximum degree of control over local zoning matters," ' " held that the local zoning ordinance was not expressly preempted because it did not involve the "conduct" of timber operations.  (*Id.* at pp. 1151-1157.)  The court proceeded to consider whether the local zoning ordinance was impliedly preempted and decided that it was not.  (*Id*. at p. 1157.)

PMC relies on the following passage:  "[A] local ordinance is not impliedly preempted by conflict with state law unless it 'mandate[s] what state law expressly forbids, [or] forbid[s] what state law expressly mandates.'  [Citation.]  That is because, when a local ordinance 'does not prohibit what the statute commands or command what it prohibits,' the ordinance is not 'inimical to' the statute.  [Citation.]  Here, County's ordinances are not impliedly preempted by conflict with state forestry law because it is reasonably possible for a timber operator to comply with both.  [¶]  The zone district

18

ordinance does not mandate what general forestry law forbids or forbid[] what general forestry law mandates. While the forestry laws generally encourage 'maximum sustained production of high-quality timber products . . . while giving consideration to' competing values (§ 4513), they do not require that every harvestable tree be cut. Accordingly, County's zoning ordinance does not conflict with state law simply because it may have the effect of placing some trees, at least temporarily, off limits to logging. Nor does it appear the Board has adopted for Santa Cruz, or any other county, rules that comprehensively address appropriate geographical locations within the county for timber harvesting." (*Big Creek*, *supra*, 38 Cal.4th at p. 1161, fn. omitted.)

*Big Creek* is not inconsistent with our analysis. Section 3106, unlike the state forestry laws in *Big Creek*, explicitly places the authority to permit new wells and wastewater injection in the hands of the State, while Measure Z bans those methods and practices. Measure Z is not a local zoning ordinance that simply regulates the location of oil drilling operations. Instead, it bans particular methods and practices. Thus, Measure Z forbids the State from permitting certain methods and practices, while section 3106 encourages those methods and practices and mandates that the State be the entity deciding whether to permit those methods and practices. The conflict here, unlike the situation in *Big Creek*, is not limited to a general State policy encouraging oil drilling and a local ordinance restricting where drilling may take place.

The fact that state law leaves room for *some* local regulation of oil drilling, such as zoning regulations identifying *where* oil drilling will be permitted in a locality, does not mean that the County has the authority to ban all new wells and all wastewater injection under Measure Z.[16] "[W]hen a statute or statutory scheme seeks to promote a certain activity and, at the same time, permits more stringent local regulation of that activity,

---

[16] Nothing in this opinion should be construed to cast any doubt on the validity of local regulations requiring permits for oil drilling operations or restricting oil drilling operations to particular zoning districts. This case involves no such regulations.

19

local regulation cannot be used to completely ban the activity or otherwise frustrate the statute's purpose." (*Great Western Shows, Inc. v. County of Los Angeles* (2002) 27 Cal.4th 853, 868.) Here, section 3106's provisions placing the authority to permit certain oil and gas drilling operational methods and practices in the hands of the State would be entirely frustrated by Measure Z's ban on some of these methods and practices. We conclude that Measure Z is preempted by state law. It follows that we need not consider PMC's challenges to the trial court's rulings that Measure Z is invalid on federal preemption and takings grounds.[17]

### B. Evidentiary Issues

PMC contends that the trial court denied it "a fair trial" because the court admitted irrelevant evidence proffered by plaintiffs and denied PMC and the County the opportunity to "contest Plaintiffs' evidence through discovery and cross-examination."

At the outset of the case, the court expressed the view that "discovery on the validity and preemption issues" was not "necessary" because these were "questions of law." PMC expressly agreed. When the court decided to have a Phase 1 trial that would "be limited to challenges to the validity of the ordinance on its face," which included the preemption and takings issues, the court envisioned little need for discovery or evidence. Plaintiffs sought to provide "some information about our operations." They argued that evidence was essential to show that Measure Z would take "all the economically viable use" of the property. The County and PMC disagreed. Their position was that such information would be beyond the scope of a facial challenge. The court suggested that there was a middle ground that could be addressed by means of a stipulated set of facts, since it needed "a basic understanding of what . . . the permits that are issued allow." At the same time, the court took the position that "I don't need testimony at this phase."

---

[17] Because we do not reach these issues, we deny Chevron's April 2019 request for judicial notice, as it concerns only the federal preemption issue.

20

Plaintiffs filed many declarations and requests for judicial notice in support of their Phase 1 arguments along with many exhibits.[18] The County filed a declaration and a request for judicial notice in support of its Phase 1 opposition argument. PMC filed a request for judicial notice of 13 items in support of its Phase 1 opposition argument.

PMC also filed written objections to plaintiffs' declarations.[19] PMC complained generally that, due to the lack of discovery, it had been deprived of the opportunity to challenge the information in the declarations. PMC also made voluminous specific objections based on lack of foundation, relevancy, improper legal opinion, speculation, the secondary evidence rule, "inadmissible opinion," and "improper opinion." The County joined in those objections and made some of its own. Plaintiffs challenged these objections. They also objected to some of the evidence offered by the County and PMC.

The Phase 1 trial was limited to standing, preemption, facial takings, due process procedural and vagueness challenges (to the procedures for resolving takings claims), a single-subject challenge, and general plan consistency challenges.[20] At the commencement of the trial in November 2017, the court noted that it had "read voluminous materials about 2 feet thick" that included not only opening statements but also "deeds to property and mineral rights; declarations from geologists and petroleum engineers; materials from the Environmental Protection Agency, [DOGGR], and the state

---

[18] Aera filed three declarations in support of its Phase 1 arguments. CRC filed five declarations and numerous exhibits in support of its Phase 1 arguments. CRC also made a request for judicial notice. NARO filed two declarations along with their accompanying exhibits. Chevron submitted six declarations and their accompanying exhibits. Chevron also submitted a glossary of terms. Eagle submitted two declarations with exhibits. Plaintiffs also submitted a joint request for judicial notice of 80 exhibits.

[19] Plaintiffs also filed supplemental declarations and additional judicial notice requests. PMC and the County also objected to plaintiffs' supplemental declarations and supplemental requests for judicial notice.

[20] The court rejected the single-subject rule challenge and the general plan consistency challenges, and those rulings are not challenged on appeal.

Water Resources Control Board; declarations from former officials with [DOGGR]; ballot measure materials and photos of campaign materials and news clips, which is not to say that all of the above are admissible." The court noted that much of this material was related to standing. The court "reassure[d]" PMC "that you're not waiving your objections by failing to repeat them here in the court. We don't need to take the time to do that." The court made specific rulings on the evidentiary objections in its statement of decision, sustaining some and overruling others. The court pointed out that much of plaintiffs' evidence was needed only because PMC had ultimately contested standing.

As PMC concedes, "[p]reemption presents a pure question of law." Indeed, PMC asks us to disregard the evidence to which it objects and decide the issues as a matter of law. None of the evidence to which PMC objects has any relevance to the state law preemption issue that we find dispositive in this case. Consequently, PMC's claims that the trial court erred in admitting irrelevant evidence and denying discovery and cross-examination could not provide a basis for reversal because PMC could not have been prejudiced by any of the evidentiary or discovery rulings that it challenges. It follows that we need not devote any analysis to these contentions as we have disregarded this evidence and decided this case as a matter of law.

## IV.    DISPOSITION

The judgment is affirmed.

_____

ELIA, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

BAMATTRE-MANOUKIAN, J.

*Chevron v. County of Monterey*
H045791

| Trial Court: | Monterey County Superior Court |
| | Superior Court No.: 16CV003978 |

| Trial Judge: | Honorable Thomas W. Wills |

| Counsel for Plaintiffs and Respondents:<br>CHEVRON U.S.A., INC. et al. | Jeffrey David Dintzer<br>Alston & Bird |
| | Theodore Joseph Boutrous<br>Gibson Dunn & Crutcher |
| | Todd Welden Smith<br>Ragghianti Freitas |

| Counsel for Plaintiff and Respondent:<br>AERA ENERGY LLC | Andrew A. Bassak<br>Hanson Bridgett |

| Counsel for Plaintiff and Respondent:<br>CALIFORNIA RESOURCES<br>CORPORATION | Matthew Thomas Kline<br>Heather A. Welles<br>O'Melveny & Myers |
| | Barton Hurst Thompson |

| Counsel for Plaintiff and Respondent:<br>EAGLE PETROLEUM, LLC | Donald Charles Oldaker<br>Clifford and Brown |

| Counsel for Plaintiff and Respondent:<br>TRIO PETROLEUM, LLC | Jason Stuart Retterer<br>JRG Attorneys at Law |

| Counsel for Plaintiff and Respondent:<br>NATIONAL ASSOCIATION OF<br>ROYALTY OWNERS-CALIFORNIA,<br>INC. | Edward Shield Renwick<br>Hanna and Morton |
| | Jacqueline M. Zischke |

| | |
|---|---|
| Counsel for Interveners and Appellants:<br>PROTECT MONTEREY COUNTY et al., | Michael Geibelson<br>Bernice Conn<br>Lucas A. Messenger<br>Robins Kaplan |
| | Deborah A. Sivas<br>Alicia E. Thesing<br>Mills Legal Clinic at Stanford Law School |
| | Hollin N. Kretzmann<br>Center for Biological Diversity |
| | Catherine Engberg<br>Kevin Patrick Bundy<br>Aaron M. Stanton<br>Shute, Mihaly & Weinberger |
| Counsel for Amicus Curiae:<br>COMMUNITIES FOR A BETTER<br>ENVIRONMENT | Katherine S. Hoff<br>Shana D.G. Lazerow |
| Counsel for Amicus Curiae:<br>CENTER ON RACE, POVERTY & THE<br>ENVIRONMENT; COMMITTEE FOR A<br>BETTER ARVIN | Paulina Nicole Torres |
| Counsel for Amicus Curiae:<br>LEAGUE OF CALIFORNIA CITIES;<br>CALIFORNIA STATE ASSOCIATION<br>OF COUNTIES | Sean Bernard Hecht<br>UCLA School of Law<br><br>Benjamin Avi Harris<br>Chambers of Judge Stephen V. Wilson |